CASE MANUFACTURING CO. v. PERKINS.

1. FRAUDULENT CONVEYANCES—CONSIDERATION.

A revived claim, to constitute a sufficient consideration to sustain a conveyance by an insolvent debtor, must be founded upon an acknowledged and recognized indebtedness theretofore existing.

2. SAME—HUSBAND AND WIFE.

Evidence reviewed, and *held* to establish that a conveyance from a debtor to his wife was made for the purpose of placing the property beyond the reach of his creditors, and that the indebtedness to the grantee, if any existed, was so disproportionate to the value of the land as to render the consideration grossly inadequate; and a decree was entered subjecting the property to the claims of creditors.

Appeal from Eaton; Smith, J. Submitted June 7, 1895. Decided September 26, 1895.

Bill by the Case Manufacturing Company against Judiah P. Perkins and others, in aid of execution. Complainant appeals from a decree dismissing the bill. Reversed.

*Powers & Stine,* for complainant.

*Huggett & Smith,* for defendants.

McGRATH, C. J. A judgment creditor assails as fraudulent a conveyance made by Judiah P. Perkins to his wife May 15, 1891, of 154½ acres of land. The deed fixes the

consideration at $8,000, and the testimony shows that the valuation put upon it at that time was not excessive. The defense is that the conveyance was made in good faith, in payment of an indebtedness due from the husband to the wife. Counsel for defendants, in their brief, give the items of indebtedness as follows:

| | | | | |
|---|---|---|---|---|
| 1. | 1864. | Money given Mrs. Perkins by her father. | $200 | 00 |
| 2. | | Interest on same to date of deed, 6 per cent | 324 | 00 |
| 3. | 1864. | Money received for sheep | 142 | 50 |
| 4. | | Interest on same to date of deed | 230 | 00 |
| 5. | 1864. | Money received for cows | 90 | 00 |
| 6. | | Interest on same to date of deed | 150 | 40 |
| 7. | 1886. | Money given Mrs. Perkins by her father | 100 | 00 |
| 8. | | Interest on same to date of deed | 24 | 00 |
| 9. | 1887. | Auction money received from estate of father, less expense of $51 | 1,261 | 00 |
| 10. | | Interest on same to date of deed | 305 | 04 |
| 11. | 1887. | Amount of notes belonging to father's estate | 1,530 | 25 |
| 12. | | Interest on same to date of deed | 367 | 26 |
| 13. | | Cash on hand at father's death, $223, less $70 | 153 | 00 |
| 14. | 1889. | First payment on sale of Ohio farm | 400 | 00 |
| 15. | | Interest on same to date of deed | 48 | 00 |
| 16. | 1890. | Interest received on $2,000 mortgage loaned Perkins | 80 | 00 |
| 17 | 1891. | Interest received on $2,000 mortgage loaned Perkins | 90 | 00 |
| 18. | 1891. | First payment of Ohio mortgage | 50.) | 00 |
| 19. | 1891. | Second payment from Ohio mortgage | 500 | 00 |
| 20. | 1891. | Received from Eaton Co. supervisors | 461 | 00 |
| 21. | | Interest on same until date of deed, May 15, 1891 | 55 | 00 |

Total amount due Mary A. Perkins ............ $7,011 45

The parties were married in 1859, in Ohio. He was a farmer, and owned a small farm there. This farm was afterwards sold, and they came to this State. A farm was bought here, which was afterwards sold, and in 1870 the land in question was bought. He was elected sheriff of Eaton county in 1884, and they moved to Charlotte in

January, 1885, where they resided until sometime after the levy, which was made in July, 1892. After his term as sheriff expired, he engaged in business at Charlotte, and at the time of the conveyance he owned and was operating a flouring mill, under the name and style of J. P. Perkins & Co. Upon the billheads appeared the names of J. P. Perkins and M. A. Perkins, the latter being his wife.

The wife testifies that, when she was married, she had some household things that were her mother's, and that her father gave her $200, a cow and a calf, and 10 sheep; that the money and the cow and sheep were used on the farm in Ohio; that the farm was sold in 1864 or 1865, and with it two cows at $45, and 20 sheep at seven dollars and a shilling a head. The entire proceeds of the cows and sheep are charged up in the itemized account aforesaid, and are the third, fourth, fifth, and sixth items, and aggregate $612.90. No agreement to pay or repay the first six items of the account, or to pay interest thereon, is even suggested by the record. No acknowledgment of any indebtedness is shown. The wife testifies that, when the next item was advanced, a note was given for the amount, viz., $100. Her father died in 1887, testate, possessed of 57 acres of land in Ohio, and some notes and other personal property. The will gave to the wife of decedent, the stepmother of Mary A. Perkins, all the household furniture, $100 in money, and $125 each year during her natural life. Subject to this legacy and annuity, and the payment of debts and funeral expenses, Mary A. Perkins took the residue. J. P. Perkins was appointed executor. The ninth item is a charge for the entire proceeds of the sale of the personal property, less expense of $51, and the eleventh item is alleged to consist of three notes of J. P. Perkins, given by him to decedent. A memorandum was produced, which is alleged to have been made at the date of the auction of the personal property at the farm in Ohio, May 14, 1887, in which these notes are set forth as follows:

J. P. Perkins' note dated November 12, 1864_____,$200
Interest, 6 per cent., due May 14, 1887_____▲_____   264
J. P. Perkins' note dated July 10, 1867_____   100
Interest due May 14, 1887_____   116
J. P. Perkins' note dated June 6, 1881_____   250
Interest due May 14, 1887_____   76 15

The aggregate amount is $1,006.15. ·Other notes found with the papers of the decedent, aggregating $524.10, appear in this statement, making $1,530.25, the eleventh item of the account. In the memorandum produced, other items, purporting to be the proceeds of sales of personal property, appear, which aggregate the amount of the ninth item of counsels' statement. This entire amount is charged up to J. P. Perkins, as due his wife. In this memorandum some 12 or more notes were given for small amounts. It nowhere appears that 11 out of the 12 were ever paid. The memorandum includes also the proceeds of the sale of household furniture, which, under the will, was bequeathed to the widow. It also includes one item which was to be paid for "in work this fall," evidently upon the farm, which was owned by the wife, and which was not sold until 1889. It further contains an item of "Pd. Bill Wood, for crying sale, $5." Not even this is credited. It further includes items, aggregating $628.85, for hay, oats, sheep, and cows, evidently bid in by the husband at the auction sale. There is no testimony tending to show that this property was ever taken from the farm, or appropriated by the husband. Mary A. Perkins testified that, at the time of the sale of the personal property belonging to her father's estate, her husband executed to her a note for $1,312, or thereabouts, as the proceeds of such sale. It appears, however, that the entire avails of that sale were but $1,261, and the amount stated by her as the amount of the note not only includes the items already referred to, but evidently includes an item of $61.54 actually charged by her husband as moneys paid to the widow as the proceeds of her household furniture disposed of at that sale, and stated upon the

memorandum to be in settlement of her claim therefor. The farm was sold March 27, 1889. The sum of $400 was paid down, and a mortgage of $2,000 was taken for the balance, payable, $500 April 1, 1891; $500 April 1, 1893; $500 April 1, 1895; and $500 April 1, 1897. Assuming that the first payment on the mortgage was made promptly, the second installment was not payable until nearly two years after the conveyance in question; yet two payments are charged against J. P. Perkins. The twentieth item is an amount paid to the husband for washing, sewing, and mending done for prisoners while J. P. Perkins was sheriff.

J. P. Perkins was not sworn. The wife testified. She had testified that she had let her husband have the second payment of $500 made on the mortgage; that "he wanted it, as he was buying the mill." It appeared, however, that he became the sole owner of the mill in February, 1891, having at that time bought out the interest of his partner, and that in March, 1892, the mill was totally destroyed by fire, and the business abandoned, whereas this amount did not become due upon the mortgage until April 1, 1893. It further appears that, at about the time when this payment matured, she made a loan and took a mortgage for $600 from one Owens. When asked respecting it, she says:

"*Q.* Now, isn't that $500 the very money you loaned John Owens, the last payment which you got from the farm of your father down there? What is it?
"*A.* No.
"*Q.* When did you lend that—
"*A.* (*interrupting*). I never loaned John Owens any money.
"*Q.* Mr. Owens, of whom you took the $600 mortgage?
"*A.* That came from the avails of the farm, I believe.
"*Q.* Isn't it a fact that the last payment of $500 that came from the Ohio farm was the money you loaned, and took that mortgage for?
"*A.* I don't think it was.

"*Q.* Are you sure it was not?

"*A.* I don't think— I am not sure. * * *

"*Q.* Isn't that $500 the very money that went into the mortgage which you took on the house and lot here in town?

"*A.* I can't say."

When asked what amount her husband owed her when he conveyed the farm she says:

"I believe it was over $5,000. * * * Because I think that was what he had. * * *

"*Q.* What was the amount of the note which Mr. Perkins gave you at the time you sold off your father's personal property?

"*A.* That I can't say.

"*Q.* What are you reading from, Mrs. Perkins?

"*A.* I have a list here of a few notes I took from my bill of sale.

"*Q.* What bill of sale?

"*A.* At the auction there, at the time. * * *

"*Q.* What was the amount of the note which Mr. Perkins gave you at the time of the sale in Ohio?

"*A.* What was it?

"*Q.* What was the amount of that note?

"*A.* That he gave me?

"*Q.* Yes.

"*A.* (*referring to paper*). I haven't no pencil. I can't compute here.

"*Q.* (*by Mr. Smith*). You know the amount? You know the amount of that note, don't you?

"*A.* I can't say how much it was. * * *

"*Q.* Well, then, your recollection now is that the note which your husband gave you down in Ohio, and that was the first note he had ever given you, and was for $223, less $70?

"*A.* Yes, sir.

"*Q.* What did you do with that note?

"*A.* I had it in my possession.

"*Q.* Until when?

"*A.* Until the conveyance of the farm.

"*Q.* When was the next note your husband gave you?

"*A.* He gave me my notes—

"*Q.* (*interrupting*). No, when was the next note he gave you—the note which he signed and gave to you?

"*A.*  He gave me one at—at the same time of the sale with the—  I think there was $1,312, I think.  [She had said that she surrendered seven notes to her husband at the time of the conveyance.]    *    *    *

"*Q.*  Didn't you tell us a little while ago, at the time of the conveyance of the farm to you, that you had seven notes against Mr. Perkins, and surrendered them to him?

"*A.*  I didn't say whether I had any more or not.  I told you I—

"*Q.*  (*interrupting*).  Did you have seven at that time? (No reply.)

"*Q.*  You don't know whether you did or not, do you, Mrs. Perkins?  (No reply.)

"*Q.*  Do you?  (No reply.)

"*Q.*  And, really, you don't know how much Mr. Perkins owed you at that time, do you?

"*A.*  He owed me over $5,000.

"*Q.*  How much over?

"*A.*  I couldn't say how much, Mr. Powers.

"*Q.*  Why do you say over $5,000?

"*A.*  Because that was what I—I gave him for the—

"*Q.*  For the farm?

"*A.*  Yes, sir.

"*Q.*  Didn't you give him but $5,000 for the farm?

"*A.*  Yes, sir; I gave him more.

"*Q.*  How much more?

"*A.*  I can't say how much more."

It is unnecessary to further review the testimony of this witness.  It is, in many respects, contradictory and unsatisfactory.  The husband might have been able to give a clearer account of the transaction.  She endeavored to speak from *memoranda*, but seemed to have no clear understanding when led away therefrom.  The first item of the charge against her husband corresponds both in amount and time with one of the notes alleged to have been held by her father against the husband.  The making of this *memoranda*, figuring up interest for 22 years upon one note and 20 years upon another, against the husband in favor of the wife, who seems to have allowed him to handle, without question or account, all her moneys, is not an ordinary transaction, to say the least.  It may have been done, however.  It is, however, clear from

this record that there has been a flagrant attempt to inflate the indebtedness existing at the date of this conveyance, which casts suspicion upon the entire transaction. Courts have, in many instances, allowed a revived claim to enter into the consideration for such a conveyance, but it is only in cases where an actual, acknowledged, and recognized indebtedness existed at some period prior to the revival. As to the first, third, and fifth items of counsels' statement, there is no claim that there was at the time any undertaking to repay, or any expectation of repayment, and, as to all the other items, any promise respecting them must be predicated upon the testimony of Mary A. Perkins, to which allusion has already been made. Her testimony does not tend to show a mere passive acquiescence in a conveyance to her in payment of an indebtedness the items of which were not discussed, but she has undertaken to show a settlement upon the basis indicated, and a surrender of evidences of indebtedness.

It is claimed, however, that, at the time of this conveyance, Perkins owned the mill property, and that complainant might have made its claim therefrom. The farm was conveyed away a few days before the note matured upon which the judgment is based. It does not appear when complainant learned of the conveyance. The mill was destroyed by fire in March, 1892, and it is shown that Perkins received upon policies of insurance about $6,000. There was a mortgage upon the real estate, and, after the fire, the mortgagee took a deed of the land in satisfaction of the mortgage. There were other mortgages, evidently upon the machinery, but not covered by the insurance policies. There was a large amount of floating indebtedness, and, although Mary A. Perkins testified that the avails of the policies were used to pay debts, it appeared at the hearing that there were a number of claims which existed at the date of the conveyance that were still unpaid.

There is but one legitimate inference that can be

drawn from this record, and that is that it was to place the farm in question beyond the reach of creditors that the conveyance was made to the defendant Mary A. Perkins. The mortgage upon the farm was $1,200. Complainant's judgment is in the neighborhood of $700. There was a margin in the farm over and above the mortgage, and the homestead interest, if any existed, of $5,300. We are satisfied that the actual indebtedness, if any existed, was so far below this figure as to make the consideration grossly inadequate.

The decree below will therefore be reversed, a decree entered for complainant, with costs of both courts, and the record remanded.

**The other Justices concurred.**