PRESTON NATIONAL BANK *v.* LEONARD.[1]

FRAUDULENT CONVEYANCES—HUSBAND'S USE OF WIFE'S MONEY—EVIDENCE OF LOAN.

> Where semi-annual dividends upon stock belonging to a married woman, but purchased in part with her husband's money, were, for a period of 12 years, turned over to the husband and used by him, without any understanding that they constituted a loan from the wife that he was expected to repay, a conveyance of property to the wife in repayment of the dividends, made after the circumstances of the parties have become reduced from affluence to insolvency, will not be upheld as against an execution creditor of the husband.

Appeal from Wayne; Frazer, J.  Submitted October 25, 1899.  Decided December 21, 1899.

Bill by the Preston National Bank of Detroit against Henry R. Leonard, Annie E. Leonard, and Albert L. Stephens in aid of execution.  From a decree declaring a lien in favor of defendant Annie E. Leonard, complainant appeals.  Reversed.

--------

[1] Rehearing denied April 3, 1900.

*De Forest Paine*, for complainant.

*George W. Radford*, for defendants Leonard.

MONTGOMERY, J.   This case relates to a portion of the property dealt with in *Stephens* v. *Leonard, ante,* 125. The present bill is filed to subject the equity of the Eliot-street property (less the homestead interest) to a sale to satisfy a judgment obtained by complainant against Henry R. Leonard.

The defendant Henry R. Leonard conveyed this property to his wife, Annie E. Leonard, by quitclaim deed, on the 25th of April, 1898, while suit was pending on complainant's demand, and two days before judgment rendered.   Under Act No. 99, Pub. Acts 1897, the burden rests on the defendants to show the *bona fides* of the transfer.   *Whelpley* v. *Stoughton,* 119 Mich. 314.   The defendants undertook this burden, and testified that Mrs. Leonard, in 1886, became the owner of $5,000 of stock of the Detroit & Cleveland Steam-Navigation Company; that from that date until after Mr. Leonard was financially crippled by a fire which burned down the building on the Gratiot-avenue property, referred to in *Stephens* v. *Leonard,* she received dividends semi-annually on this stock at the rate of 10 per cent. per annum, except for one year, when the rate was 8 per cent.; that she turned the proceeds over to her husband, who used the proceeds, and has never accounted for them to her, except by the conveyance in question.   The circuit judge treated the various transactions as loans, and declared a lien in favor of Mrs. Leonard for the several amounts, with interest.   This holding was based upon the testimony of Mr. and Mrs. Leonard.   The important question is, Was it a loan?   The two witnesses, it is true, refer to it in general terms as a loan, but neither attempts to tell what was said at any time between them.   Mr. Leonard testified in regard to one of the dividend checks as follows:

"*Q.* What did she do with it?
"*A.* I have testified that she handed it over to me.

"*Q.* Indorsed it over to you?

"*A.* Loaned it to me; yes, sir.

"*Q.* She loaned it to you?

"*A.* Yes, sir.

"*Q.* She indorsed it over to you?

"*A.* Whenever they came in. She did the same thing for 12 years.

"*Q.* What did she say when she indorsed over that dividend check to you?

"*A.* I have no recollection.   *   *   *

"*Q.* Did you ever have any agreement with her to pay interest?

"*A.* On what?

"*Q.* On dividends.

"*A.* No, sir; no specific agreement.

"*Q.* Did she ever ask you to pay interest?

"*A.* She has; yes, sir; since.

"*Q.* Since the fire?

"*A.* Yes, sir."

Mrs. Leonard testified on her direct examination as follows:

"*Q.* Since the purchase of that stock, who has received the dividends paid by the company?

"*A.* I have received the checks from Mr. Carter.

"*Q.* What did you do with them?

"*A.* I gave them to my husband; loaned them to invest for me, or to take care of them for me, I might better say, perhaps; I didn't need them.

"*Q.* State whether at any time you had any intention or anything was said whereby you were making him a present of those moneys.

"*A.* I didn't intend to make him a present of them; no, sir."

On cross-examination the witness testified further as follows:

"*Q.* You have a recollection that those dividend checks came to you, from time to time, twice a year?

"*A.* Yes, sir.

"*Q.* That is all you do remember about it,—that you got the checks and turned them over to Mr. Leonard?

"*A.* I got the checks, and I gave them to him to invest for me, or take care of them for me, I might better say; I don't mean invest.   *   *   *

"*Q.* And can you remember what was said to Mr. Leonard by you at any time when you indorsed over one of those checks to him?

"*A.* No; I have already testified that I could not, before the commissioner, clearly.

"*Q.* Can you remember what he said to you?

"*A.* No.

"*Q.* When, at any time, did you say to Mr. Leonard that he owed you any money for anything?

"*A.* I don't know but that was the first time after the fire.   *   *   *

"*Q.* What did Mr. Leonard say to you?

"*A.* Mr. Leonard agreed with me that first day after the fire.   We were pretty downhearted.

"*Q.* He agreed with you that your money had gone with the fire?

"*A.* Yes, sir.

"*Q.* Prior to that time, had you ever received any note or writing from him acknowledging a debt to you?

"*A.* No, sir.

"*Q.* Had you ever talked to him at any time about paying you interest?

"*A.* No, sir; I never should have asked him at that time to pay me interest, I suppose.

"*Q.* You say you gave these dividend checks to Mr. Leonard to take care of for you?

"*A.* That was the understanding.

"*Q.* When was that understanding?

"*A.* With myself, in my own mind.   I didn't suppose my husband would defraud me of them.   I never knew that it was necessary to make any agreement with my husband for money that might be coming to me or owing to me.   I could have gotten it if I wanted to.

"*Q.* You always considered, when you wanted money, you could have it, until the time of the fire?

"*A.* I did.

"*Q.* All you had to do was to ask for it?   As a matter of fact, up to the time of the fire, did you ever suppose that you had a legal claim against your husband that you could enforce at law?

"*A.* If I thought anything about it, I should have supposed so.   I never thought of my husband in that connection.   I didn't think I should take any legal action against my husband.   It never occurred to me that I would have to.

" *Q.* You were living prosperously, and never had occasion to think of such things? You never had occasion, when you indorsed over those dividend checks, to think of such things?

"*A.* No; if I had, I should have mentioned them, I suppose."

We think it is clear enough from this testimony that the dividend checks were handed over to the husband without any expectation of recovering the amount. The situation of the parties supports this theory. They were living at the time in affluence. Some $1,500 of Mr. Leonard's money had gone into the purchase of this very stock. What more natural than that the income should be turned into his hands? There was no agreement to repay. The money was handed to him freely, and, we are convinced, without any understanding by either that an indebtedness was being created. That money of the wife, thus appropriated by the husband by her consent, and without any intention of creating an indebtedness, cannot be the basis of an equitable right to sweep away the assets from creditors, is, we think, clear. *Ball* v. *Phenicie*, 94 Mich. 355; *In re Hauer's Estate*, 140 Pa. St. 420 (23 Am. St. Rep. 245); *Humes* v. *Scruggs*, 94 U. S. 22; *Case Manfg. Co.* v. *Perkins*, 106 Mich. 349; *Hanson* v. *Manley*, 72 Iowa, 48; *Grover & Baker Sewing-Machine Co.* v. *Radcliff*, 63 Md. 496.

Some criticisms are made of the procedure. The criticisms are lacking in merit.

The decree will be reversed, and a decree entered in this court for complainant, with costs of both courts.

Hooker, Moore, and Long, JJ., concurred. Grant, C. J., did not sit.