CRANE *v.* WALDRON. [1]

1. CONSTITUTIONAL LAW — RULES OF EVIDENCE — FRAUDULENT CONVEYANCES—BILLS IN AID OF EXECUTION—PRIMA FACIE CASE —DUE PROCESS OF LAW.

Act No. 99, Pub. Acts 1897 (3 Comp. Laws, § 10203), providing that, in suits in aid of execution, complainant shall make a *prima facie* case by introducing in evidence the judgment against the principal defendant, the execution, with levy thereon indorsed, and proof of the conveyance complained of, prescribes a mere rule of evidence, and is not violative of the constitutional guaranty of "due process of law." GRANT and MOORE, JJ., dissenting.

2. SAME—TITLE TO STATUTE—SUFFICIENCY.

The object of the act is sufficiently indicated by its title, viz., "An 'act to provide for the change of rules of evidence in cases where bills in aid of execution are filed."

3. SAME—LOSS OF EXECUTION—SECONDARY EVIDENCE.

The fact that the execution in a given case is lost does not exclude the application of the statute, but parol evidence of its contents may be given.

4. SAME—APPEAL—OBJECTIONS.

A contention that the contents of a lost execution were not sufficiently proved will not be sustained on appeal, where there was proof of a valid judgment, and the issue and levy of an execution thereunder, and the only objection to the testimony was that it was "incompetent and immaterial."

Appeal from Eaton; Smith, J. Submitted January 9, 1902. (Docket No. 43.) Reargued January 14, 1903. Decided April 28, 1903.

Bill by William Crane against John Waldron and Mary Ann Waldron in aid of execution. From a decree for complainant, defendants appeal. Affirmed.

*S. B. Roe* and *Richard Rudabaugh*, for complainant.

*Thomas, Cummins & Nichols*, for defendants.

[1] Rehearing denied September 22, 1903.

Hooker, C. J. On July 12, 1900, complainant obtained a judgment against John Waldron in a justice's court in Shiawassee county for about $170. On July 21, 1900, a transcript was filed, and an execution was issued by the circuit court to the sheriff of Eaton county, and on July 23, 1900, it was levied upon some village lots in that county, the title to which was formerly in John Waldron. On June 26, 1900, John Waldron, who then lived in Shiawassee county, deeded the same to his daughter, Mary Ann Waldron, who for several years had been working out in the capacity of domestic. On December 10, 1900, this bill was filed in aid of the execution, to which the defendants answered separately, denying that the transfer was fraudulent, and asserting that it was in payment of $250, of which $200 had been earned by Mary, and loaned to or expended for the benefit of John, Waldron, previous to the transfer. Upon the hearing, complainant made proof of the judgment, the issue of execution, the levy, and the deed. The execution itself was not produced, but was shown to be lost, and secondary evidence was admitted. The defendants offered no testimony. A decree was rendered in behalf of complainant, and the defendants have appealed.

Counsel for defendants attack the constitutionality of Act No. 99, Pub. Acts 1897, being 3 Comp. Laws, § 10203, which provides that, "in all suits in aid of execution, the complainant shall make a *prima facie* case by introducing in evidence the judgment against the principal defendant, the execution with the levy or levies thereon indorsed, and proof of the conveyance complained of." They also question the sufficiency of complainant's evidence. They say that:

"Bills in aid of execution only lie where the conveyance was made with the intent to hinder, delay, or defraud creditors. Section 9533, 3 Comp. Laws. If the grantee is a purchaser for a valuable consideration, then it must further appear that he had notice of his grantor's fraudulent intent. Section 9537, Id. To establish a *prima facie*

case, therefore, it must appear: *First,* that the conveyance was made with the intent to defraud creditors; *second,* that the purchaser gave no consideration, or else took with notice of his grantor's fraudulent intent. The statute of 1897 attempts to make the judgment, execution, or deed, without the aid of other proof, evidence of fraudulent intent on the part of the grantor, and evidence of notice of such fraudulent intent on the part of the grantee."

Their claim is that "due process of law" requires that some evidence be given of a fraudulent intent by Waldron, shared by his daughter.

The power of the legislature to prescribe rules of evidence is undoubted. When one is in debt, and deeds all of his property subject to execution to another, who has no visible property, it cannot be said that there is no evidence tending to show fraud. It was within the legislative power to say that these facts shall be *prima facie* evidence of a fraudulent intent, making it necessary for the persons charged with fraud to give some testimony to the contrary. Cooley, Const. Lim. (6th Ed.) 450; *Gruner v. Brooks,* 126 Mich. 465 (85 N. W. 1085); *Molitor v. Robinson,* 40 Mich. 200; *Buhl Iron Works v. Teuton,* 67 Mich. 623 (35 N. W. 804); *Hatch v. Fowler,* 28 Mich. 205; *Webster v. Bailey,* 40 Mich. 641; *Cooper v. Brock,* 41 Mich. 488 (2 N. W. 660); *Kipp v. Lamoreaux,* 81 Mich. 299 (45 N. W. 1002); *U. S. v. Lee Huen,* 118 Fed. 442.

The title to the act is "An act to provide for the change of rules of evidence in cases where bills in aid of execution are filed." This is sufficient, unless we are to say that the title must be an index of the provisions of the act, which is not required.

It is contended that the failure to produce the execution at the trial was an omission which excludes the application of the statute. We are of the opinion that secondary evidence is admissible, under this statute, in accordance with the general rule.

A number of technical reasons are urged in support of the proposition that the contents of the execution were not

proved. The testimony regarding the execution was not challenged, except under the very general objection that the proof was incompetent and immaterial. We discover nothing that should have indicated to the court that objection was made that it was not shown to be properly directed, or properly tested, or issued in the name of the people, etc., or that it was not returnable reasonably, or did not properly recite the judgment or name the parties. Under the circumstances, the statement by Cooper that he received an execution in the *case stated* from Shiawassee county, the admission of the validity of the judgment upon which it was issued, the copy of the transcript of judgment, and the notice duly filed, are sufficient to convince the mind, in the absence not only of evidence, but of any claim, to the contrary.

The decree is affirmed, with costs.

CARPENTER and MONTGOMERY, JJ., concurred with HOOKER, C. J.

GRANT, J. (*dissenting*). The bill in this case was filed in aid of an execution upon a judgment for $167.83, exclusive of costs, rendered July 12, 1900, by a justice of the peace. A transcript was duly taken to the circuit court, execution issued, and levy made. The bill, after setting forth the facts, alleges a deed, made on June 27 (it was in fact made June 26), 1900, by the defendant John and his wife to the defendant Mary, his daughter, and that said deed was made without consideration, and was fraudulent and void. The answers deny all the material allegations of the bill as to the transfer of the property; allege a *bona fide* consideration; that Mary worked out as a domestic, and gave the greater portion of the money she earned to her father, upon the promise that her father should convey the lands to her for her own use. Complainant made his case by proving his judgment, execution, levy, the deed from defendant John to his daughter, Mary, and that the land was worth about $400. Defend-

ants introduced no evidence, and a decree was rendered for the complainant.

The sole evidence of fraud upon which the decree in this case is based is the deed made by defendant John to his daughter, Mary, and the fact that he was at the time in debt.   The bare execution of a deed and the fact of indebtedness by the grantor are, therefore, made to establish a fraud, for which alone the deed could be set aside. Complainant relies upon Act No. 99, Pub. Acts 1897, the title and body to which read as follows:

"An act to provide for the change of rules of evidence in cases where bills in aid of execution are filed.

"SECTION 1. That in all suits begun or hereafter to be begun by the filing of bills in aid of execution, the complainant shall make a *prima facie* case by introducing in evidence the judgment against the principal defendant, the execution with the levy or levies thereon indorsed, and proof of the conveyance or conveyances complained of. The burden of proof shall then be upon the judgment debtor, or the person or persons claiming through or under him, or the person or persons whom it is claimed are holding property in trust for said judgment debtor, to show that the transaction or transactions are in all respects *bona fide*, or that such person or persons are not holding as a trustee or trustees of said judgment debtor."

This legislation is unique.   It stands alone.   It has no precedent or posterity.   No such law is found upon the statute books of any other State.   We cannot, therefore, have the benefit of the reasoning and conclusions of other courts in determining the constitutionality of the act.   We must determine it upon reason and principle.   For centuries the usual method of transfer of title to land has been by deed.   Thousands of them are executed every day.   No other method of obtaining title, except upon execution, decree, or by adverse possession, is known to the law.   Presumptively these transfers are honest.   Ever since civilization began they always have been, and still are, so considered.   Like all other business transactions, they are daily executed, delivered, and received in good

faith. Without this presumption, business could not well be carried on. The law does not limit its effect to cases between members of the same family, which courts of law as well as of equity scan with great care, where lands are transferred by one who is in debt. The earmarks of fraud in such cases are easily traceable, and courts have found no difficulty in dealing with them under the rules of evidence which have always existed. But the law stamps as presumptively fraudulent every deed made by every person against whom is a judgment unpaid, and that, too, whether the debt was contracted before or after the deed was made. Most business men are borrowers of money. Merchants borrow money at the banks in order to meet their current indebtedness, and buy goods upon credit. Many borrow money with which to make investments. If the legislature, under the specious plea of the mere change in the rules of evidence, can make the execution of a deed presumptive fraud, it can also make the execution of every other contract a presumptive fraud, no matter whether it exists in writing or in parol. Contracts of sale of real and personal property, bills of sale, promissory notes, in fact every act or transfer of property essential to the business life of the country, can be made by the legislature a presumptive fraud upon simply proving that, at the time of the transfer or execution of the paper, the maker or vendor was in debt for any sum, however trivial.

The statute under which this suit was brought to set aside the deed makes every such conveyance "made with the intent to hinder, delay, or defraud creditors" void. Section 9533, 3 Comp. Laws. That act further provides that the question of fraudulent intent in all cases arising under it shall be deemed a question of fact, and not of law. Section 9536, Id. Now, the legislature, by Act No. 99, Pub. Acts 1897, has provided that one of the ordinary business transactions of life—an act essential to the maintenance of business—is presumptively a fraud, and shall stamp every party thereto as guilty of a fraud, for which the debtor and grantor might be imprisoned under

the fraudulent debtor's act.    Section 9556, Id.    That law provides that a debtor may be arrested and imprisoned upon proof that he has assigned, removed, or disposed of his property with intent to defraud his creditors.    It follows that the legislature, if this law be sustained, can provide that the execution of any paper by a debtor is sufficient proof of his fraud to confine him in prison.    The validity of this law cannot be determined upon the theory that it includes only transfers between members of the same family.    Many of such transfers, however, are entirely valid, as this court and others have held (in fact, the great majority of them are); others are invalid, as the courts have frequently held.    But it never before entered the mind of man to conceive that transactions presumptively honest, and which, in at least 99 cases out of 100, are honest, shall be presumptively dishonest and fraudulent.

Let us look further at the result of this law.    The grantor and grantee may both be dead when the suit is tried.    All evidence of the transaction, except the bare fact of the execution of the deed, is buried with the dead.    Both parties may be stamped, under this act, as guilty of fraud, by simply proving that the grantor, at the time of the transfer, was in debt.    The grantee may have paid full consideration, and yet his family be deprived of their property, and left in poverty, with their father and husband disgraced by the decree of the court, and that upon the bare proof that the grantor of their husband and father was in debt at the time he executed the deed.

Does this law simply change a rule of evidence ?    In my judgment, it does not.    It deliberately attempts to make a presumptively honest act a presumptive fraud.    It deals with facts, not with evidence.    It does not take up some rule of evidence and change it.    The execution of a deed, though the grantor be in debt, is not of itself evidence of fraud.    There always have been, and always ought to be, some other facts connected with it which tend to show a fraudulent intent.    Evidence is defined to be any matter

of fact the effect, tendency, or design of which is to produce in the mind a persuasion, affirmative or disaffirmative, of the existence of some other matter of fact.   Best, Ev. § 11.   It is a logical and reasonable rule that, in order to be evidence, the facts presented must tend to prove the fact in issue.   The fact in issue in this case is fraud on the part of two persons, the grantor and the grantee of a deed.   Do the execution of a deed and the indebtedness of the grantor prove or tend to prove the two essential facts that both were guilty of intent to defraud the creditors of the grantor, and that no consideration was paid ?   Would not such a holding be repugnant to reason and common sense ?

The right of the legislature, within certain limitations, to prescribe rules of evidence, is conceded.   *People* v. *Cannon*, 139 N. Y. 32 (34 N. E. 759, 36 Am. St. Rep. 668); *Board of Com'rs* v. *Merchant*, 103 N. Y. 143 (8 N. E. 484); *State* v. *Beswick*, 13 R. I. 211 (43 Am. Rep. 26); *Meadowcroft* v. *People*, 163 Ill. 56 (45 N. E. 303, 35 L. R. A. 176, 54 Am. St. Rep. 447).   What these limitations are there may be some difficulty in determining. Courts have recognized this.

In *Board of Com'rs* v. *Merchant* it is said: "While the power has its constitutional limitations, it is not easy to define precisely what they are."   The same opinion says: "It would not be possible to uphold a law * * * which made that *prima facie* evidence of crime which had no relation to a criminal act, and no tendency whatever by itself to prove a criminal act."   The same rule must apply in civil cases where fraud or crime is the real issue.   The law the constitutionality of which was questioned in that case made the drinking of intoxicating liquor on the premises *prima facie* evidence that it was sold with intent to be drunk on the premises.

The rule is concisely and well stated in *People* v. *Cannon*:

"The limitations are that the fact upon which the presumption is to rest must have some fair relation to, or natural connection with, the main fact."

In *Com.* v. *Williams*, 6 Gray, 1, the law made delivery of intoxicating liquors in or from any building or place other than a dwelling house *prima facie* evidence of a sale. The act was sustained upon the theory that delivery is essential to, and is some evidence of, every sale of property. Justice Thomas filed a very able dissenting opinion, maintaining that an act in itself innocent cannot be made by the legislature presumptive evidence of guilt.

In *State* v. *Beswick, supra,* a law which made the notorious character of the premises, or the notoriously bad or intemperate character of persons frequenting the same, or the keeping of the implements or appurtenances usually appertaining to grogshops, tippling shops, or places where such liquors are sold, *prima facie* evidence that such liquors were kept on such premises for sale, was held unconstitutional and void. Whether that holding is in accord with the weight of authority we need not determine. The following language is so clearly in point that I quote it:

"Indeed, to hold that a legislature can create artificial presumptions of guilt from facts which are not only consistent with innocence, but which are not even a constituent part of the crime when committed, is to hold that it has the power to take away from a judicial trial, or at least substantially reduce in it, the very element which makes it judicial. To hold so is to hold that the legislature has power to bind and circumscribe the judgments of courts and juries in matters of fact, and in an important measure to predetermine their decisions and verdicts for them. It is true the accused has the right of defense left to him, and may, if he can adduce satisfactory evidence, rebut the statutory presumptions; but the production of such evidence is not always easy, even with the right to testify in his own behalf; and the right to testify in his own behalf, having been granted, can be abrogated, by the legislature. It is not one of those great and immemorial rights which lie embedded in the phrase 'the law of the land,'"—citing authorities.

In *State* v. *Buck*, 120 Mo. 479, 495 (25 S. W. 573), a law providing that the failure of a bank should be *prima*

133 MICH.—6.

*facie* evidence that the officer received deposits knowing the bank to be insolvent was sustained. The decision, however, left the law ineffective, because it held that the burden of proof was not really changed, and that the *prima facie* case did not warrant a conviction. But under this act the courts are compelled to render a decree for complainant upon bare proof of judgment and levy. The court in *State* v. *Buck* likened that case to the rule of the common law that an assault upon another with a deadly weapon, at some vital part, presumes an intent to kill, and that the possession of stolen property recently after its theft raises the presumption that the possessor was the thief.

In *Meadowcroft* v. *People, supra*, the law provided that a banker receiving deposits when insolvent is presumptively guilty of a fraud in so receiving them. The law was sustained upon the theory that:

"He [the banker] holds himself out to the public and to his customers as being possessed of money and capital, and therefore to be safely trusted. It is his duty to know, and he is, under all ordinary circumstances, bound to know, that he is solvent, and it is criminal negligence for him not to know of his own insolvency."

A similar case is *State* v. *Beach*, 147 Ind. 74 (46 N. E. 145, 36 L. R. A. 179).

How would lawyers, or laymen, even, look upon a decision of a court or an act of the legislature making every person who purchased from an insolvent banker a promissory note, or mortgage, or land, presumptively guilty of fraud ?

It is worthy of note that most, if not all, of such decisions to which our attention has been called, hold that the acts of the legislature did not change the burden of proof. It is also significant that the acts involved in those cases make only those facts *prima facie* evidence which are so closely allied to the offense charged that they are of themselves some evidence of the intent required to constitute the offense, or some evidence of the main fact in issue.

They all are aimed at persons while living, and do not attempt to make their acts *prima facie* evidence of fraud against their grantees, vendees, heirs, and devisees. The circumstances surrounding the transactions which, by the acts in those cases, were made *prima facie* evidence, are so indicative of wrong, and so exclusively within the knowledge of the party charged, that courts have held it not unreasonable to call upon him for explanation. This is the basis upon which those decisions rest, and, in my judgment, is the only basis upon which they can rest.

How can such a doctrine be applied to the daily business transactions of life, and to the daily transfers of property, which are always, and of necessity must be, *prima facie* honest and valid? It is neither dishonest, nor evidence of a fraud or intent to commit a fraud, to be in debt. It is not dishonest, neither is it evidence of dishonesty or fraud, to buy or sell property, real or personal, when one is in debt. If it were, probably a majority of the sales and transfers of property, both real and personal, would be presumptively fraudulent. It would, in my judgment, be monstrous to hold that a transfer of property by a debtor is presumptively a fraud. Debtors often sell property for the purpose of paying certain of their debts, and the law has always justified them in so doing. It would be more monstrous to hold that his grantee is presumptively a participant in the fraud. By what process of reasoning can it be held that a sale and transfer of property by one who is in debt is any evidence of an intent to defraud? If a statute should provide that, in a suit against an alleged forger to recover money paid on an alleged forged note, the production of the note and proof that the alleged maker did not execute it should make a *prima facie* case against the defendant, could such an act be sustained upon the pretense of the right of the legislature to change the rules of evidence? There is, in my judgment, no relation between the fact of indebtedness and the intent to commit a fraud or to defraud the debtor's creditors. The former has no tendency to prove the latter,

especially on the part of a grantee or vendee, the sole party in interest in the suit. For this reason I think the act is void.

Counsel for the complainant seek to sustain this law upon the theory, "if the right is not expressly prohibited, or prohibited by implication, by the State Constitution, the legislature has not exceeded its power, and the statute is constitutional;" citing *Sears* v. *Cottrell*, 5 Mich. 251. As applied to the facts of that case, the rule there stated is not disputed. There are, however, some things the legislature cannot do, although not prohibited by the Constitution, and the lawbooks are replete with such cases. Some things are so repugnant to the principles of our government and to reason and common sense that the legislature cannot enact them into valid laws. The legislature cannot declare presumptively honest citizens to be presumptively dishonest, or the daily and presumptively honest transactions of life to be presumptively fraudulent transactions, under the thin guise of a change in the rules of evidence. Every citizen under our Constitution is entitled to the presumption of honesty in his daily transactions, and he who attacks his honesty is bound to prove his dishonesty and his fraud, before he can deprive him either of his liberty, his property, or his good name. The language of the Supreme Court of the United States, speaking through Justice Chase, in *Calder* v. *Bull*, 3 Dall. 387, is here appropriate:

"I cannot subscribe to the omnipotence of a State legislature, or that it is absolute and without control, although its authority should not be expressly restrained by the constitution or fundamental law of the State. * * * The nature and ends of legislative power will limit the exercise of it. * * * There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power,—as to authorize manifest injustice by positive law, or to take away that security for personal liberty or private property for the protection whereof the government was established. An act of the legislature (for I cannot

call it a law) contrary to the great first principles of the social compact cannot be considered a rightful exercise of legislative authority."

This language is quoted with approval in *City of Janesville* v. *Carpenter*, 77 Wis. 288 (46 N. W. 128, 8 L. R. A. 808, 20 Am. St. Rep. 123). That case involved a law of Wisconsin which reads as follows:

"It shall be unlawful and presumptively injurious and dangerous to persons and property to drive piles, build piers, cribs, or other structures, * * * in Rock river, within the limits of the county of Rock, and the doing of any such act shall be enjoined at the suit of any resident taxpayer without proof that any injury or danger has been or will be caused by reason of such act."

A bill was filed asking for an injunction under this statute, and the court below sustained it. The question arose upon a motion to dissolve the temporary injunction. The supreme court said:

"This statute is, if possible, more marvelous than the complaint. * * * The legislature usurped the judicial power of the courts by the enactment of this statute. It adjudicates an act unlawful and presumptively injurious and dangerous which is not and cannot be made to be so without a violation of the constitutional rights of the defendant, and imperatively commands the court to enjoin it without proof that any injury or danger has been or will be caused by it. It reverses very many decisions of this court on the very questions involved in it, and which have the effect of a judicial determination of the defendant's rights of property. It violates section 2 of article 7 of the State constitution, which provides that the judicial power of the State, both as to matters of law and equity, shall be vested in the various courts. It takes away the jurisdiction of the courts to inquire into the facts, and determine the necessity and propriety of granting or refusing an injunction in such a case according to the established rules of a court of equity. *Ervine's Appeal*, 16 Pa. St. 256 (55 Am. Dec. 499). It is said in that case:

"'That is not legislation which adjudicates in a particular case, prescribes the rule contrary to the general law, and orders it to be enforced. Such power assimilates itself more closely to *despotic rule* than to any other attribute of government.'"

So the legislature in this case adjudicates an act, in itself lawful, in itself no evidence of fraud, and in itself presumptively fair and honest, to be presumptively a fraud, and commands the court to enter a decree upon it. I think this a clear invasion by the legislative department of the authority conferred by the Constitution upon the judicial department. .

In *Sears* v. *Cottrell*, 5 Mich. 251, 261, Justice CHRISTIANCY, in his majority opinion, said:

"I do not say, and I am not willing to say in advance, that an act of the legislature might not be so utterly subversive of all the purposes of justice, so oppressive in all its features and objects, and so repugnant to the fundamental principles of republican government, that it ought to be declared void on that account, though it might not conflict with any provision of the Constitution. See *Bowman* v. *Middleton*, 1 Bay, (S. C.) 252."

Mr. Ordronaux, in his recent work, says:

"But this express theoretic view of legislative power, which in England has led to the doctrine that an act of parliament cannot be questioned or its authority controlled in any court of justice, must, in the United States, be considered as meaning always power exercised within the constitution, and in accordance with the principles of our social compact. Hence no omnipotence attaches itself to the power of an American legislature, even where the constitution has imposed no explicit restraint, because in the exercise of that power it may have violated some fundamental maxim of a free government." Ord. Const. Leg. p. 346.

In the leading case of *People* v. *Township Board of Salem*, 20 Mich. 452 (4 Am. Rep. 400), the right of the legislature to authorize townships to vote money to aid in the construction of railroads was involved. It was held unconstitutional. There was no express provision of the Constitution against such legislation, and the three prevailing opinions did not mention any provision of the Constitution violated by the law. Justice COOLEY, at page 473, said:

"It is conceded, nevertheless, that there are certain limitations upon this power, not prescribed in express terms by any constitutional provision, but inherent in the subject itself, which attend its exercise under all circumstances, and which are as inflexible and absolute in their restraints as if directly imposed in the most positive form of words."

Chief Justice CAMPBELL, at page 495, said:

"There are purposes the illegality of which would be so manifest that, although not mentioned in any constitution, no one could hesitate to say the burden was not validly imposed to further them."

In the recent case of *Michigan Sugar Co.* v. *Auditor General*, 124 Mich. 674 (83 N. W. 625, 56 L. R. A. 329, 83 Am. St. Rep. 354), no express provision of the Constitution was pointed out which the sugar bounty act violated. Justice LONG, speaking for the entire court, said:

"The legislature is the mere creature of an organic law, deriving all its power from the Constitution. Its power within those limits must be admitted to be plenary, except so far as otherwise specifically limited; but outside those limits it is as powerless as if specifically prohibited."

Mr. Cooley, in his valuable treatise, says:

"It does not follow, however, that in every case the courts, before they can set aside a law as invalid, must be able to find in the constitution some specific inhibition which has been disregarded, or some express command which has been disobeyed.   *   *   *   The right of local self-government cannot be taken away, because all our constitutions assume its continuance as the undoubted right of the people, and as an inseparable incident to republican government." Cooley, Const. Lim. *174.

See, also, *Hanson* v. *Vernon*, 27 Iowa, 28 (1 Am. Rep. 215); *State* v. *Mayor, etc., of Des Moines*, 103 Iowa, 76 (72 N. W. 639, 39 L. R. A. 285, 64 Am. St. Rep. 157).

Does this act secure to a party the benefit of due process of law, as guaranteed by the bill of rights in our Constitution and by that of the United States? These bills of right provide that no person shall be deprived of his life, liberty, or property contrary to "the law of the land," or

without "due process of law." These two expressions have been construed to mean the same thing, and are those used in the bills of right of the various States. Courts and law writers have found difficulty in giving definitions to this language which shall be applicable to all cases. This is due to the diversity of cases. Cooley, Const. Lim. *353. I quote a few of these definitions: Chancellor Kent says: "It means law in its regular course of administration through courts of justice." 2 Kent, Com. 13. Mr. Webster, in the *Dartmouth College Case*, defines it thus:

"By the 'law of the land' is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not, therefore, to be considered the law of the land." *Dartmouth College* v. *Woodward*, 4 Wheat. 518.

Justice COOLEY says that no definition embodies more tersely and accurately the correct view of the principle than is contained in the words of Justice Johnson in *Bank of Columbia* v. *Okely*, 4 Wheat. 235:

"After volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this: That they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice."

Mr. Cooley defines it thus:

"Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs." Cooley, Const. Lim. *356.

For other definitions, see Brannon on the Fourteenth Amendment, chap. 11.

"A law which would practically shut out the evidence of a party, and thus deny him the opportunity for a trial, would substantially deprive him of due process of law." *Board of Com'rs* v. *Merchant, supra.*

I quote with approval the language of Mr. Justice Thomas in a dissenting opinion in *Com.* v. *Williams, supra:*

"If the legislature may say an innocent act is presumptive evidence of guilt, it would be only one step further in the same direction to make that presumption conclusive. * * * Where the act proved is equally consistent with innocence or guilt, the presumption of innocence must stand. The plainest dictates of justice require it. The right of trial by jury includes it. A statute which takes from the accused the shield of that presumption essentially impairs that right."

Due process of law does not mean the subpœna or other writ by which a party is brought into court at the instance of a party plaintiff or complainant. If, after he has been brought in, he is at any stage of the proceeding deprived of the benefit of "the law of the land," the proceeding against him is void, and he has not had the benefit of due process of law.

This act, as already shown, does not require a plaintiff or complainant to produce evidence of any fact which in and of itself is evidence of fraudulent or criminal intent. It requires him to prove only certain facts which in and of themselves are entirely consistent with honesty, which always have been, and always must be, so considered. It brings defendant into court by process of subpœna, and then says to him: "Prove that the legal title to your property is good; that you bought it in good faith; that you paid a valuable consideration for it; that your grantor did not, in selling to you, commit a fraud, or, if he did, that you did not participate in it." If such grantee be dead, it says substantially the same thing to his widow and children, his heirs and devisees. If he has become insane, in which case it is impossible for him to testify, his property must be taken away from him without a

particle of evidence to show any intent to participate in the fraud of another. If he be dead, his widow and children in many cases would be powerless to show the *bona fides* of the transaction, and not only must lose their property, but must have their husband and father decreed to have been guilty of a fraud, without one particle of evidence to show it. Is this due process of law ? Is it due process of law to say to a man's widow and children, ''Prove the good faith of your husband and father in obtaining title to this property, which may be your homestead, or it shall be taken away from you, and turned over to others ?'' ''The right to private property is a sacred right.'' Cooley, Const. Lim. (6th Ed.) 436. Is not this sacred right frittered away when the legislature says to its citizen, '' Your title is presumptively a fraud, because some grantor in the chain of title conveyed it when he was in debt; and, unless you can show that it was not a fraud, you must lose it, whether you are the original grantee or some subsequent grantee, or their heirs or devisees ? ''

Under this act the court has no discretion. It is not required to exercise any judgment. It must render a decree upon bare proof of judgment, levy of execution, and the deed, not only against the original vendee, whether sane or insane, but against his vendees, his widow and children, his heirs and his devisees, without proof of a single fact which, in the history of jurisprudence, has ever been held to be proof of fraud or a fraudulent purpose. In many cases years may have passed since the transaction. The property may have changed hands a dozen times. The grantee's heirs may have lived upon and improved the property, and under this act they must lose it, without proof of a single fact to indicate fraud or fraudulent intent. Does this law provide for a hearing or an inquiry, within the definition of Mr. Webster ? Is it a trial, within his definition, where the legislature has prescribed that, upon acts in themselves innocent and honest, the court must render judgment ? Is this ''law in its regular course of administration,'' within the definition by

Chancellor Kent? Is it within "the established principles
of private rights and distributive justice," as defined by
the United States Supreme Court? Is it within "the
settled maxims of law, and such safeguards as those max-
ims prescribe," within the definition of Justice COOLEY?
I think these questions must be answered in the negative.
In my judgment, such an act does not provide for due
process of law, and is therefore unconstitutional and void.

The decree should be reversed, and the case remanded
for complainant to introduce further evidence, if he chooses
to do so.

MOORE, J., concurred with GRANT, J.