## L. STARKS CO. *v.* EPPINK.

1. CREDITORS' SUITS—BILL IN AID OF EXECUTION—REAL PROPERTY —DEBTOR AND CREDITOR—BURDEN OF PROOF—EVIDENCE.

    In a suit by judgment creditors to set aside a conveyance of real property from a judgment debtor to her daughter executed after judgment was obtained against her and not paid for in full at the time of the execution of the papers, evidence considered and *held,* to be insufficient to sustain the burden of proof resting upon the defendant, under 3 Comp. Laws, § 10203 (5 How. Stat. [2d Ed.] § 12864).

2. SAME — NOTICE — JUDGMENT — CONSTRUCTIVE NOTICE — DUTY TO INQUIRE.

    The purchaser from a judgment debtor is chargeable with such knowledge of the facts as would put an ordinarily prudent person on inquiry with the duty of investigating the situation of the grantor, and, in the event of failure so to do, is chargeable with bad faith, and it is not necessary, to defeat the transfer, to establish by actual proof the existence of an intent on the part of the grantee to participate in the fraudulent purpose.

3. SAME—BONA FIDE PURCHASER—FRAUD.

    If the purchaser is not a creditor it is enough that he knows sufficient of the facts to put a prudent man upon inquiry as to the motive for the transfer.

4. SAME—EXECUTION—RETURN—SETTING ASIDE RETURN OF OFFICER.

    An unauthorized return of the sheriff of an execution placed in his hands for levy upon property of the defendant in the judgment prior to the filing of a bill in aid of execution was a mere irregularity which defendant waived by express agreement on the part of counsel in her presence in open court that the return might be treated as not having been made.

5. SAME—JUDGMENT—AFFIDAVIT OF PUBLICATION.

    The complainant's case was not defeated by failure to file a printer's affidavit prior to the entry of an order *pro confesso* to show the publication of statutory notice of appearance as against one of the defendants, upon com-

plainant's filing an affidavit made by its solicitor who knew the facts that the publication had been made pursuant to the order of the court.

Appeal from Missaukee; Lamb, J. Submitted January 14, 1915. (Docket No. 90.) Decided March 18, 1915.

Bill by the L. Starks Company, a foreign corporation, against Tannette Eppink and Sena Taylor in aid of execution. From a judgment for defendants, complainant appeals. Reversed.

*Hall & Gillard*, for complainant.

*Gaffney, Miltner & Millington*, for defendants.

STONE, J. This is a bill in aid of execution. Prior to April 8, 1912, the L. Starks Company had commenced in the circuit court of Missaukee county, in chancery, a case for an accounting against John B. Eppink and Tannette Eppink, as defendants, and on said day the circuit judge, after a hearing of the case, filed findings of fact and conclusions of law, and ordered that a decree be drawn in favor of complainant against both of the defendants. At that time the defendant Tannette Eppink was the owner in fee simple of 220 acres of land in Missaukee county worth on an average $10 an acre. She was also the owner in fee simple of lots 12, 13, and 14 of the village of Lucas, worth $200, and also the owner of lot No. 1 of the village of Lucas, which was her homestead, and which she testified was worth $1,500.

On the 13th day of June, 1912, a warranty deed, dated the 25th day of May, 1912, was recorded in the office of the register of deeds of said county. By this deed the defendant Tannette Eppink purported to convey to Sena Taylor, her daughter and codefendant, for the express consideration of $2,000, the 220 acres

of land, and said lots 12, 13, and 14 of the village of Lucas. This was all the property that Mrs. Eppink owned, except her homestead lot, above referred to.

On the 31st day of July, 1912, a final decree was made in the case above referred to. As far as that decree is material to the issue of the present case, it provided as follows:

"That the defendant John B. Eppink was acting in a fiduciary capacity with the above-named complainant, L. Starks Company, and that while so acting in said capacity, the defendant John B. Eppink misappropriated $1,202.10 of the money belonging to complainant; that of this sum the defendant Tannette Eppink received the amount of $510.63, leaving the balance owing by the defendant John Eppink to the complainant by reason of such misappropriation by acting in the fiduciary capacity aforesaid $691.57."

\* \* \*

"That the defendant Tannette Eppink is indebted to the complainant in the sum of $510.63, together with interest thereon from August 1, 1910, at 5 per cent. per annum, being the amount of the money misappropriated by the defendant, John Eppink, as aforesaid, which was used for the benefit of the defendant, Tannette Eppink."

On the 1st day of October, 1912, an execution was issued on said decree and delivered to the sheriff of said county. This execution was returnable November 30, 1912.

On the 15th day of October, 1912, the sheriff of said county made levy upon the 220 acres of land above referred to as belonging to Tannette Eppink, lots Nos. 12, 13, and 14, and also lot No. 1 of the village of Lucas. A certificate of levy to this effect was signed by the said sheriff, and filed by him in the office of the register of deeds for said county on the 15th day of October, 1912, at 9 o'clock in the forenoon. He did not indorse the levy on the execution. It appears, and is undisputed, that at the time this levy was made the sheriff was instructed by the solicitors

for the complainant not to return said execution until they directed him so to do.

On December 15, 1913, the bill in the instant case was filed, together with a notice of *lis pendens*. An order of publication as to the defendant Sena Taylor was signed the 24th day of May, 1913, and filed on May 26, 1913. It appears that the order was duly published, the first publication being on June 5, 1913, and the last publication on July 17, 1913. The proof of publication made by the printer was received by the solicitors for complainant about the 18th of July, 1913. Through an oversight this proof of publication was not filed in the case, but was placed in the office files of the solicitors for the complainant. The solicitors for the complainant were not aware that this proof of publication had not been filed until the 1st day of July, 1914, and they were first made aware of that fact by the findings of the court in this case. It appears, however, that, on November 15, 1913, an affidavit of nonappearance of the defendant Sena Taylor was made by one of the solicitors for complainant, and an order *pro confesso* as to the defendant Sena Taylor was filed. That affidavit contains the following language:

"That, although the order herein made by this court that the defendant Sena Taylor should cause her appearance to be entered in this cause within four months from the date thereof has been duly published, as directed by the said order, as appears by the affidavit of Charles R. Burleson on file, and although more than four months have elapsed since the said order was made, this deponent nor the firm of Hall & Gillard, solicitors for said complainant, have not received any notice that an appearance has been entered in this cause by or on behalf of said defendant, Sena Taylor, nor has the appearance of said Sena Taylor been entered therein, as appears by the records and files in this court, or the knowledge or belief of this deponent."

The order *pro confesso* recites the following:

"On filing due proof of publication of notice of the order requiring the defendant Sena Taylor to appear and answer the bill of complaint filed in this cause within four months from the date of such order, and the time limited in said order for the entering of such appearance having expired, and having filed due proof that said defendant Sena Taylor has not appeared in said cause," the order *pro confesso* as to her was entered.

This cause was heard in the court below on the 20th day of May, 1914. Upon the hearing it first came to the knowledge of complainant's solicitors that on the 30th day of November, 1912, the said sheriff returned and filed the execution which had been issued as hereinbefore stated, with the following return thereon:

"By virtue of the within execution, I have levied and collected $170.84, part of the damages in the case within mentioned, and I can find no goods or chattels whereon to levy the remainder thereof."

On its coming to the attention of the solicitors of the complainant that this execution had been returned, the following occurred upon the trial:

"*Mr. Hall:* This execution appears in the files. It should not be in the files. I directed the sheriff to hold that execution, and this is the first time that I knew it was in the files. It was filed November 30, 1912. (Mr. Hall shows execution to Mr. Gaffney.)

"*Mr. Gaffney:* There was $170 paid. * * *

"*Mr. Hall:* That was the $160, and the interest thereon. * * * That execution should not be returned. I didn't know it was returned before.

"*The Court:* Was there any levy made under it?

"*Mr. Hall:* Yes, sir; there was, and I have a certified copy made on October 15, 1912, and I do not know why the officer returned that against my instructions. There is no question but what a returned execution is not the basis of a bill in aid of execution, although it is up to Mr. Gaffney what he wants to do; whether he wants to consider that not returned and

let us go on and try out the matter; or whether we will have an adjournment and make a petition that that return be stricken from the files. I don't know what we can do if the sheriff does not obey instructions. I think we have a right to have that return stricken from the files. He made his levy, but he has not indorsed the levy on there at all. As I understand it, this man is not sheriff of Missaukee county at this time.

"*The Court:* No; he is not. According to the files that execution had been returned prior to the beginning of this suit, and you folks would be presumed to have knowledge of it, and technically that is the situation.

"*Mr. Hall:* That is true, your honor. The bill was not filed until February, 1913. I was not up until October, and at that time the levy was made, and then we had to wait until after the return day; then there has been some talk all along of settling it up.

"*The Court:* At the time you filed your bill the files in the register in chancery's office showed that this execution had been returned?

"*Mr. Hall:* That is true.

"*Mr. Gaffney:* I will consult with my clients a moment.

"(At this point Mr. Gaffney withdrew into the judge's private room for a time, and after emerging from the judge's room Mr. Gaffney said:)

"*Mr. Gaffney:* Your honor, after consulting with Mrs. Taylor, Mrs. Eppink, and John Eppink, we have decided to waive, and do waive, any question that might arise. I might say now that the return of the sheriff to the execution be declared no return, and that the execution be deemed to be in his hands awaiting the result of the trial.

"*Mr. Hall:* Very well; I thank you.

"*Mr. Hall:* We offer this certified copy of the deed in evidence.

"*Mr. Gaffney:* No objection.

"*The Court:* It will be received and marked Exhibit B.

"(Certified copy of the levy and execution received in like manner, without objection.)

"*Mr. Hall:* Your honor, with the findings and the decree of the court in the original case, the admission

in the answer to the second paragraph of the bill of complaint that previous to the rendition of the judgment, and at the time the indebtedness occurred, Mrs. Eppink was the owner of the property mentioned in that deed, the execution as amended, the deed from Mrs. Eppink to Mrs. Taylor and the levy and execution, we rest. There is no question about the amount of $510.63 being still due and unpaid.

"*Mr. Gaffney:* Oh, no, sir."

Tannette Eppink, one of the defendants, was then sworn in her own behalf. She testified, upon direct examination, that on the 25th day of May, 1912, she was the owner of the property above described, and that on that day she conveyed the same away, with the exception of the homestead, to Mrs. Taylor, her daughter, and that she was paid the consideration mentioned in the deed. Upon cross-examination she testified that she was a witness in the original case against herself and her son. She testified that she did not know that the company was asking for a judgment against her, and claimed that she did not ascertain that a judgment had been rendered against her until about half a year after that; that she was surprised when she heard there was such a judgment against her; that Mrs. Taylor made a payment of $500 in June; that she had used the money, but could not tell for what purpose; that she received the remainder of $1,500 from her daughter in Chicago between Christmas and New Year. She testified that the property which she conveyed to Mrs. Taylor was all the property that she owned, except the house and lot where she lived in the village, which latter was worth $1,500. She could not specify what she had done with the last money which she received from Mrs. Taylor, only it was gone.

"*Q.* Is it all gone?
"*A.* I think it is; I may have some of it.
"*Q.* Well, if you have it, where is it?

"*A.* Is it necessary to tell that?
"*Q.* Yes.
"*A.* I couldn't tell you where it is."

Mrs. Sena Taylor was sworn as a witness in her own behalf, and testified that she was the daughter of the last-named witness, Mrs. Eppink; was married and lived in Chicago; that the deed to her was in her husband's safe in Chicago. She further testified that she was not at the home of her mother on the 25th of May, but had been previous to that time; that she did not come prepared to pay for the land at that time; that she paid her mother the consideration mentioned in the deed in two installments; that she paid the first installment of $500 in June at her mother's home, and the balance of $1,500 at her own home when her mother was there between Christmas and New Year, and at that time took receipts from her mother; that she did not have the receipts with her, but they were at home with the deed; that she did not receive the deed when she was in Michigan and made the $500 payment, but left it with her brother, John, whether for recording or not she was not able to state, but she presumed it would be recorded, but didn't remember what was said regarding the deed.

John Eppink swore that he knew of the making of the deed; that it was left with him with instructions to have it recorded; that he neglected to send it to Mrs. Taylor, and that he never delivered it to anybody. He testified that he did not know what his mother did with the money, only that she had given him some money since that time.

It appeared that a Mr. Shreve, an investigator for the William J. Burns National Detective Agency, had been over from Chicago in the fall of 1912, and had an interview with Tannette Eppink, with reference to the purchase of a part of the property which had been conveyed to Mrs. Taylor. He testified in re-

buttal that Mrs. Eppink admitted that she owned one 40 of the property which adjoined that of a Mrs. Boerts, and that she also owned 80 acres on the other side. When asked if she wanted to sell the property, she said that she didn't know, and then spoke about her son having trouble with L. Starks Company; that she said in reality she owned the property, but that her son had got into trouble with the Starks people and they were trying to get the land away from her, but to save it she had deeded it to her daughter, Sena Taylor, who lived in Chicago; that the property was really hers, but she would have to get a deed from Mrs. Taylor; and that she had turned her property over to Sena Taylor to keep L. Starks Company from doing her out of it.

It appeared that this deed was given to, or taken by, Mr. Shreve when he was at Mrs. Eppink's. He further testified that he had a talk with Mrs. Taylor in Chicago, in which she said that she thought it would be best for them to sell a part or all of the property, and that she was willing to do whatever her mother desired her to do in the case, and that this was repeated a number of times.

There is much more of the testimony of this witness from which it appears that a deed with the name of the grantee in blank had been sent by Mrs. Taylor from Chicago to Mrs. Eppink in contemplation of a sale of the property. Much of the testimony of the man Shreve was denied by Mrs. Taylor and her mother. Mrs. Taylor admitted that he had called upon her in Chicago and had claimed that he wanted to buy, especially the property adjoining Mrs. Boerts. She denied, however, that she had ever talked to Mr. Shreve about the complainant. She was unable to state how many acres she got by the purchase, or how much land was embraced in any of the descriptions mentioned in the deed. When asked how many

acres she got by the deed, she answered: "I couldn't tell; I got all that my mother had anyway." She stated, when asked what the property was worth, that she did not know anything about the value of the land. John B. Eppink testified, upon cross-examination, that some of it was worth $20 or $25 an acre, but that on an average perhaps $10 an acre, and that the three lots were worth about $200.

By authority of section 10203, 3 Comp. Laws (section 12864, 5 How. Stat. [2d Ed.]), after the complainant had made its *prima facie* case, the burden was then cast upon the defendants to show that the transaction was in all respects *bona fide*.

Was this property conveyed for the purpose of hindering, delaying, or defrauding this complainant? That such was the purpose of Tannette Eppink, we think, is established beyond question, and was so found by the trial court. It is a tax upon one's credulity to believe that Mrs. Eppink did not know at the time she conveyed away this property that the trial court had made a finding against her in the sum already stated. She had been a party and witness in what appeared to have been a contested suit. She had been represented by at least two counsel upon that hearing. That every member of the family, including Mrs. Taylor, who had recently visited her mother, knew the result of that suit, is, in our opinion, beyond question.

The only question remaining upon the merits is: Did the daughter, Mrs. Taylor, know of this condition, and did she, in the receiving of this conveyance, know the purpose which the mother had in deeding the property away? There are many earmarks about the testimony in the case that lead an unbiased mind to believe that the whole transaction was a scheme to place this property in the hands of the daughter, and away from this complainant's execution. The facts

that the deed was made in the absence of Mrs. Taylor; that no money was paid until, as found by the circuit judge, on the 19th of June following, when $500 was paid; that the final payment of $1,500, if ever actually made, was made 60 days and upwards after the notice of the levy of execution had been duly filed—are all very significant. The fact that no satisfactory explanation is made as to what was done by Mrs. Eppink with the money leads one to criticise very closely this "family affair," and the testimony of these defendants.

There is no claim that Mrs. Taylor was a creditor, or that her mother was in any way indebted to her. The rule of law has been repeatedly stated by this court to be as follows:

"Such a knowledge of facts as will put an ordinarily prudent man on inquiry will affect the good faith of one who takes a transfer of property from an embarrassed owner. Actual participation in the fraudulent intent of the latter is not necessary to defeat the transfer." *Hough* v. *Dickinson,* 58 Mich. 89 (24 N. W. 809).

In *Bedford* v. *Penny,* 58 Mich. 424-428 (25 N. W. 381), this court held that actual participation by a purchaser in the fraudulent intent with which one makes a sale to defraud his creditors is not a necessary condition to its avoidance; if the purchaser is not a creditor, it is enough that he knows what would put a prudent man upon inquiry as to the motive of the sale. See, also, *Jordan* v. *White,* 38 Mich. 253; *Allen* v. *Stingel,* 95 Mich. 195 (54 N. W. 880); *Gumberg* v. *Treusch,* 110 Mich. 451 (68 N. W. 236).

In *Gordon* v. *Alexander,* 122 Mich. 107 (80 N. W. 978), this court said the following request to charge should have been given:

"The plaintiff was not a creditor of McDonald, but a purchaser; and, if he had knowledge of facts sufficient to put an ordinarily prudent man on inquiry,

such knowledge on the part of Gordon would be sufficient to avoid the sale, without any active participation in the fraud by him."

See, also, *Lyon* v. *Clark,* 129 Mich. 381 (88 N. W. 1046).

We have examined with care the decisions of this court under the section above quoted (section 10203, 3 Comp. Laws, section 12864, 5 How. Stat. [2d Ed.]).

That the burden is cast upon the defendant to show the *bona fides* of the transaction in all respects has been repeatedly held by this court since the adoption of the foregoing statute. *Smead* v. *Rogers,* 120 Mich. 441 (79 N. W. 638); *Preston National Bank* v. *Leonard,* 122 Mich. 381 (81 N. W. 264; *Ullman* v. *Thomas,* 126 Mich. 61 (85 N. W. 245); *Gruner* v. *Brooks,* 126 Mich. 465 (85 N. W. 1085); *Wilcox* v. *Hammond,* 128 Mich. 516 (87 N. W. 636); *Crane* v. *Waldron,* 133 Mich. 73 (94 N. W. 593); *Shepard* v. *Schrutt,* 163 Mich. 485 (128 N. W. 772).

We have frequently said that in cases of this nature family transactions should be carefully scrutinized. In our opinion, the defendants have not sustained the burden of proof cast upon them by the statute. They have failed to show that the transaction was in all respects *bona fide.*

The trial court reached a different conclusion, but, this being a chancery case, it becomes our duty to examine the whole evidence. It does appear by the findings of the court below, and in that respect we agree with the court, that the $170.84 indorsed on the execution was intended to apply on said judgment against John Eppink; that said amount was for certain potatoes, in the warehouse, which had been disposed of by that defendant in execution. The trial court dismissed the bill of complaint, and the complainant has appealed.

The trial court criticised the testimony of the wit-

ness Shreve as "too pat to be credible." The same may be said of the testimony of Sena Taylor as to the transactions between her and her mother. The fact that she carefully took receipts from her mother for the two payments is, to say the least, unusual. The consideration was mentioned in the deed, and the acknowledgment therein of the receipt thereof was certainly a sufficient receipt for the payment. With the merits of the case in this condition, it is necessary for us to speak of the failure to indorse the levy upon the execution, and the sufficiency of the filing of the notice of levy. We need only refer in this connection to *Vroman* v. *Thompson,* 51 Mich. 452-456 (16 N. W. 808), and *Shepard* v. *Schrutt, supra.*

In view of the admission made by defendants' counsel in open court (to say nothing about the application to set aside the return of the officer upon the execution), we think it should be held that that irregularity was waived in open court by counsel in the presence of the defendants, and that they are estopped thereby. We are also of the opinion that the irregularity in not filing the printer's affidavit when the order *pro confesso* was entered was not fatal to the proceeding. The affidavit of the solicitor for complainant was, at least, some evidence of the publication. The affidavit of the printer does not exclude other proof, such as the affidavit of some other person who knows the fact. *Matthews* v. *Supervisors,* 48 Mich. 587 (12 N. W. 863).

We have examined with much care the sections of the statute to which our attention is called by defendants' counsel in their brief, to wit, sections 9533 and 9537, 3 Comp. Laws (sections 11417, 11421, 4 How. Stat. [2d Ed.]), as well as the authorities cited by counsel.

The evidence in the case is such that we cannot hold that Mrs. Taylor was a *bona fide* purchaser. At

most, she paid but $500 upon this purchase before she had notice by the filing of the levy. The effect of such notice was to put her upon inquiry, before she made her claimed final payment. *Matson* v. *Melchor*, 42 Mich. 477 (4 N. W. 200). See section 9224, 3 Comp. Laws (section 11386, 4 How. Stat. [2d Ed.]).

The decree of the circuit court will be reversed, and one entered in this court in favor of the complainant in accordance with the prayer of its bill, with costs of both courts to the complainant against both defendants.

BROOKE, C. J., and McALVAY, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.